UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: BLESSEY ENTERPRISES, INC., ET AL.   \*   CIVIL ACTION

  \*   NO. 08-4282
REF: ALL CASES

  \*   SECTION "L" (3)

## FINDINGS OF FACT & CONCLUSIONS OF LAW

I.   PROCEDURAL HISTORY

This case arises out of a collision that occurred on the lower Mississippi River on February 27, 2008, between the M/V MITCH JONES and her tow, and the M/V ROBERT N. STOUT and her tow. The M/V MITCH JONES was owned and operated by Blessey Enterprises and Blessey Marine Services. The M/V ROBERT N. STOUT was owned *pro hac vice* and operated by Inland Marine Service. Ingram Barge Company owned the ROBERT N. STOUT as well as twenty-five barges in its tow.

The parties agree that on the night of February 27, 2008, the M/V ROBERT N. STOUT pushing 25 loaded grain barges was headed downriver on the Mississippi and the M/V MITCH JONES pushing 4 loaded tank barges was headed upriver. The vessels and their tows collided at approximately 2338 hours near Mile 135. Limitation proceedings were filed by both vessels and were consolidated for discovery and trial. Claims were made by the owners or owners *pro hac vice* of the vessels, barges, and cargo. The parties agree that the post-collision value of the involved vessels exceeds the claims so limitation is moot. The parties have settled or bifurcated issues of damages and this trial addresses solely the question of liability for the collision. The

settlement of the third party claims have been funded and the ultimate allocation will be determined by the percentage of fault, if any, that the Court allocates to the parties.

The Court has carefully considered the testimony of all of the witnesses, the exhibits entered into evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

To the extent that any findings of fact may be construed as a conclusion of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute a finding of fact, the Court adopts them as such.

## II. FINDINGS OF FACT

1. Ingram Barge Company is the owner, and Inland Marine Service, Inc. is the owner *pro hac vice* of the M/V ROBERT N. STOUT, a 7200 horsepower towboat, official number 566553, measuring about 167.3 feet in length and 45 feet in breadth.

2. Blessey Enterprises, Inc., is the owner *pro hac vice*, and Blessey Marine Services, Inc., is the operator of the M/V MITCH JONES, a 4900 horsepower towboat, official number 10075882, measuring 143.9 feet in length and 42 feet in breadth. Blessey Marine Services, Inc, is the owner *pro hac vice* and operator of the MITCH JONES.

3. On the night of February 27, 2008, the ROBERT N. STOUT was headed down the Mississippi River in a southerly direction pushing twenty-five grain-loaded hopper barges. The tow was configured five barges wide and five barges deep. The vessel was being piloted by Captain Donald Scott Sprenger. With the twenty-five barges, the ROBERT N. STOUT's flotilla was 1,142 feet in length and 175 feet in breadth. Captain

Sprenger intended to continue down river until he reached the area near the Lucy Light, which is located near mile 134.9 AHP (Above Head of Passes). Once there, he planned to dock against the West Bank upriver or above Lucy Light for discharge of his tow.

4. On this date, the MITCH JONES was headed upriver or northbound. This vessel was pushing four loaded red flag barges and was being operated by Captain Worley B. Dietrich. Her tow was configured two wide and two deep. The MITCH JONES's flotilla was 800 feet in length and 104 feet in breadth. The MITCH JONES's final destination was Catlettsburg, Kentucky.

5. Both vessels were equipped with Automatic Information Systems (AIS) which transmit pertinent data via satellite that can be used to obtain real-time access to information on vessels in the area, including the position, speed, projected position, and identification of the vessels. The ROBERT N. STOUT was equipped with a CEACT AIS unit. The MITCH JONES was equipped with a Jeppesen AIS unit. The CEACT and Jeppesen systems have similar capabilities and provide the same basic information.

6. The United States Coast Guard Vessel Traffic Service (VTS) department monitors and records the AIS data from vessels on the Mississippi and records radio communication over Channel 67. Channel 67 is the primary radio channel used to communicate by vessels on the lower Mississippi River. The Coast Guard's VTS/AIS recording of the events and communications leading up to the collision were introduced into evidence. The authenticity and accuracy of the VTS/AIS recording was not disputed.

7. A review of this material reflects that at approximately 23:26:20 hours on that night, as the ROBERT N. STOUT was proceeding down river near mile 137.5 AHP, Captain

Sprenger announced his position and intended course by stating:

> Robert Stout southbound up around Triangle Reserve, Stout's going to be backing in up above Lucy on the West Bank.

8. Captain Sprenger was navigating the ROBERT N. STOUT by line of sight. There was no lookout on either the lead barge or in the tug's wheelhouse. The night was relatively clear and Captain Sprenger testified he could see the lights of three vessels near the West Bank in the general area where he was headed.

9. These vessels were the M/V SAFETY QUEST, the M/V MISS DORIS, and the M/V MISS NELDA. The ROBERT N. STOUT was equipped with CEACT and two radar units. Captain Sprenger consulted the radar but did not look at the CEACT. Based on where the monitor was positioned, Captain Sprenger would have had to turn his view 45 degrees away from visual sight of where he was navigating to look at the CEACT. Captain Sprenger testified that he detected the MISS DORIS and the MISS NELDA on radar. Captain Sprenger testified that he could not detect the SAFETY QUEST or the MITCH JONES on radar because of congestion and static. Because of the congestion there was a great deal of chatter on the radio.

10. The SAFETY QUEST and MISS DORIS were associated with Triangle Fleet which was a fleeting area located on the West descending bank, upriver or just above Lucy Light. The MISS NELDA was pushing barges up river in the vicinity of the Triangle Fleet. At this time, the SAFETY QUEST and MISS DORIS were stopped and positioned along the West Bank near the lower end of Triangle Fleet. At 23:29:10 hours, the MISS DORIS contacted the ROBERT N. STOUT. The ROBERT N. STOUT and MISS DORIS agreed to a two-whistle, or starboard, passing.

11. At 23:29:35 hours, about two seconds after the agreement between the ROBERT N. STOUT and the MISS DORIS for a two-whistle passing, the MISS NELDA, the third vessel whose lights Captain Sprenger saw, called the ROBERT N. STOUT to advise of its position and intended course and to make a passing agreement. The MISS NELDA and the ROBERT N. STOUT agreed to a two-whistle meeting, meaning that the ROBERT N. STOUT intended to pass the MISS NELDA on ROBERT N. STOUT's starboard side.

12. The effect of these agreements among the ROBERT N. STOUT, MISS NELDA, and MISS DORIS was that as the MISS NELDA proceeded up river, SAFETY QUEST and MISS DORIS would be located between MISS NELDA and the West Bank of the river. Further, as the ROBERT N. STOUT proceeded down river, all three of these vessels would be between the ROBERT N. STOUT and the West Bank, with the STOUT the furthest from the West Bank.

13. At 23:32:40 seconds, Captain Dietrich of the MITCH JONES called Captain Neal Garon of the MISS NELDA to arrange a passing agreement. The MITCH JONES agreed not to overtake the MISS NELDA until the MISS NELDA had passed the SAFETY QUEST, the MISS DORIS, and the ROBERT N. STOUT, at which point the MITCH JONES would pass on the one whistle, or port, side. This conversation was recorded as follows:

    23:32:40, JONES:    Mitch Jones to Miss Nelda.
    23:32:44, NELDA:    Miss Nelda.
    23:32:45, JONES:    I think thats you I might be easin up behind back here. Have you got a barge?
    23:32:50, NELDA:    Uh... I got nine of 'em there. Nine empty. Yeah, I see ya back there.
    23:32:54, JONES:    I couldn't tell. Couldn't see no lights above you or anything. Alrighty, which way you

|  | think the best way to get around you here... I see somebody coming up here. Ah, maybe he'll be by, by the time I get up there to you. |
| 23:33:08, NELDA: | Ain't gonna be much room in here. We'll be three wide, but uh... After I get clear of all this, the Safety Quest and all, you can keep comin' for that one. |
| 23:33:18, STOUT: | Thank you. Mitch Jones. |

Captain Sprenger testified that he did not hear this conversation over the radio and at that time did not know that the MITCH JONES was behind the MISS NELDA and proceeding up river. It is clear, however, that Captain Dietrich on the MITCH JONES knew that the ROBERT N. STOUT was in the vicinity and proceeding down river towards the MITCH JONES. The MITCH JONES did not attempt to contact the ROBERT N. STOUT.

14. The ROBERT N. STOUT continued down river with its tow and began to pass the SAFETY QUEST and the MISS DORIS on two whistles as agreed and was setting up to pass the MISS NELDA on the two whistle also as agreed. Simultaneously, the MISS NELDA continued up river passing the MISS DORIS and SAFETY QUEST on one whistle as agreed with those vessels.

15. As the ROBERT N. STOUT prepared to pass the MISS NELDA, Captain Sprenger for the first time saw the lights of the MITCH JONES heading up river behind the MISS NELDA as the MITCH JONES moved more starboard and began to pull further into mid-river and into the path of the ROBERT N. STOUT. Captain Dietrich testified that he felt his maneuver was safe because he thought the ROBERT N. STOUT was backing in to the West Bank. But in fact the ROBERT N. STOUT was traveling down river at twelve miles per hour. At this time, the two vessels were less than one half mile apart. Captain

Sprenger made radio contact with the captain of the MITCH JONES. The VTS recorded the following communications between the ROBERT N. STOUT and the MITCH JONES:

| | | |
|---|---|---|
| 23:36:09, STOUT: | | (unclear) this other – The other northbound boat. I got your light on Skipper, don't – don't come out in the river any more. |
| 23:36:20, JONES: | | I was getting ready to cross unless you're going to be going southbound, Sir. You takin' off? |
| 23:36:25, STOUT: | | I am southbound, Skipper. I'm making about 12 miles an hour. |
| 23:36:31, JONES: | | I apologize. You got such a point down in there I thought you were backin' in. |
| 23:36:37, STOUT: | | Oh, no, no. I'm trying to shove off these guys. |
| 23:36:42, JONES: | | Sorry about that. We'll see you on two. |

16. Recognizing that a collision was unavoidable, Captain Sprenger of the ROBERT N. STOUT put his engines to full speed and steered hard to port. At approximately 2338 hours and near Mile Marker 135, the vessels collided with the MITCH JONES coming into contact with the second barge, starboard side of the ROBERT N. STOUT'S flotilla.

### III. CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter, which arises from a maritime casualty pursuant to Article III of the United States Constitution and 28 U.S.C. § 1333, the Court's admiralty and maritime jurisdiction. The limitation of liability suits instituted by Blessey Marine and Inland Marine Services, Inc., and the allegations surrounding same, fall within the admiralty and maritime jurisdiction of this Court under 33 U.S.C. § 1333(1), 46 U.S.C. app. 183, *et seq*. Venue is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. 28

U.S.C. § 1391(b).

2. "The Inland Navigational Rules, 33 U.S.C. §§ 2001-2038, govern the conduct of vessels navigating [in this portion of] the Mississippi River. These Rules and common law principles of admiralty law require prudent seamanship and the exercise of reasonable care. A finding that a vessel's Captain has violated these Rules or principles may constitute negligence and impose liability on the Captain's employer." *Inland River Towing, Inc. v. Am. Commercial Barge Line Co.*, 143 F. Supp. 2d 646, 649 (N.D. Miss 2000) (citing *Weathers Towing, Inc. v. M/V HERMAN POTT*, 570 F.2d 1294 (5th Cir. 1978); *Miller v. Semet-Solvay Div., Allied Chem. Corp.*, 406 F.2d 1037, 1038 (4th Cir. 1969)).

3. "A Captain's violation of one of the Inland Navigational Rules invokes a rule of law known as The *Pennsylvania* rule. The *Pennsylvania* rule provides that when a ship violates a statutory rule of navigation intended to prevent collisions, 'the burden rests on the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.'" *Id.* (quoting *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873)). "If one party carries this burden, the burden of proof as to causation is then shifted to its opponent." *Id.*

4. Rule 2 (Responsibility) of the Inland Rules provides, in part, that "[n]othing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33 U.S.C. § 2002(a).

5. Rule 5 (Look-out) of the Inland Rules provides that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 2005.

6. Rule 7 (Risk of collision) of the Inland Rules provides, in part, that "[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist." 33 U.S.C. § 2007.

7. Rule 9 (Narrow channels) of the Inland Rules provides, in part, that

   (a) Keeping near to outer limit of channel or fairway which lies on vessel's starboard side; exception

   > (i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.

   > (ii) Not withstanding paragraph (a)(i) and Rule 14(a), a power-driven vessel operating in narrow channels or fairways on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner and place of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i), as appropriate. The vessel proceeding upbound against the current shall hold as necessary to permit safe passing.

   33 U.S.C. § 2009(a).

8. Furthermore, the Vessel Bridge-to-Bridge Radiotelephone Act applies on the navigable waters of the United States. 33 U.S.C. §§ 1201-1208. The Coast Guard has promulgated regulations pursuant to the Act which require the master, person in charge of a vessel, or designated pilot to maintain a listening watch. 33 C.F.R. § 26.05. "Each person who is required to maintain a listening watch ... shall, when necessary, transmit and confirm, on

the designated frequency, the intentions of his vessel and any other information necessary for the safe navigation of vessels." 33 C.F.R. § 26.04(b).

9. Applying these Rules and legal principles, the Court finds that the evidence adduced at trial establishes that both vessels were at fault in causing the collision. Accordingly, the Court must allocate liability for damages in proportion to the relative fault of each vessel. *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 410 (1975).

10. With respect to the MITCH JONES, the vessel and her captain violated several rules of the road, and the Radiotelephone Act. Captain Dietrich turned the MITCH JONES starboard further towards mid-river based on a mistaken understanding of the course and intentions of the ROBERT N. STOUT, in violation of the passing agreement he had reached with Captain Garon of the MISS NELDA, and without making any effort to contact the ROBERT N. STOUT to investigate its intentions. In so doing, Captain Dietrich violated Rules 2, 5, and 7 by disregarding the ordinary practice of seamen and by failing to use all available means appropriate to the prevailing circumstances and conditions to determine if a risk of collision existed. In making that turn, Captain Dietrich also violated Rule 9 by failing to hold as necessary to permit safe passing of the ROBERT N. STOUT. In making that unannounced turn without broadcasting his intentions and other pertinent information, Captain Dietrich also failed to comply with 33 C.F.R. § 26.04(a).

11. With respect to the ROBERT N. STOUT, the vessel and her captain violated Rule 5 of the Inland Rules by failing to maintain a proper lookout. The area of the Mississippi through which the ROBERT N. STOUT was traveling was crowded with vessel traffic.

Further, the ROBERT N. STOUT was traveling at night and its radar was obscured and there was excessive chatter on the radio making communication difficult to understand. Captain Sprenger testified that he did not hear the exchange between the MITCH JONES and the MISS NELDA, a vessel with which he had made a meeting agreement. Pursuant to Rule 9(a)(ii), as the downbound vessel the ROBERT N. STOUT had the duty to initiate maneuvering signals with upbound vessels. To successfully carry out that duty it was necessary for Captain Sprenger to locate all of the vessels in the vicinity. Despite that duty as the downbound vessel, and despite the prevailing circumstances and conditions, Captain Sprenger did not look at his CEACT AIS system and did not have anyone in the wheelhouse look at the system to verify whether he had identified and made appropriate agreements with all vessels in the vicinity. Captain Sprenger testified that had he consulted his CEACT system, he would have been alerted to the presence of the MITCH JONES traveling up river behind the MISS NELDA. (This is consistent with Exhibit 17, which is the CEACT strip which shows the location of the MITCH JONES.) Had Captain Sprenger known of the location of the MICH JONES as he made his approach, he could have initiated radio contact and made a safe crossing agreement. The Court therefore finds that Captain Sprenger did not use "all available means appropriate in the prevailing circumstances and conditions" to maintain a proper lookout, in violation of Rule 5.

IV.     **SUMMARY**

Based on the foregoing findings of fact and conclusions of law, the Court finds that the MITCH JONES was 90% at fault and the ROBERT N. STOUT was 10% at fault for the collision

and the damages should be apportioned in these percentages.

The Court will set a status conference with the parties in the near future to discuss trial of the bifurcated damages issues.

New Orleans, Louisiana, this 9th day of September, 2010.

_____
**UNITED STATES DISTRICT JUDGE**